UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 5:06 CR 330 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREA ASBERRY, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

This case arises from a two-count Indictment that alleges that Andrea Asberry, a.k.a. Andre Shawn Byrd ("Defendant"), knowingly made false representations during the unlawful purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6), by stating that he had never been convicted of a misdemeanor crime of domestic violence, and that Defendant knowingly possessed a firearm in violation of 18 U.S.C. § 922(g)(9) because he had previously been convicted of domestic violence. Currently pending before the court is Defendant's Motion to Suppress (ECF No. 9) evidence and statements made during the police stop of his vehicle. The court held a hearing on this Motion on November 7, 2006, and November 20, 2006. For the reasons set forth below, Defendant's Motion to Suppress is granted in part and denied in part.

## I. FACTUAL BACKGROUND

### A. Prosecution's Account

On the evening of June 8, 2006, approximately ten or eleven officers in the vice, gang, and drug task force units of the Canton Police Department were engaged in a special undercover surveillance operation to investigate complaints of street level drug crime. Lieutenant Ronald W. Shank ("Shank") was driving an unmarked car with Detective Gerald Zachary ("Zachary"). Both men were wearing plain clothes. At approximately 10:15 p.m., Shank and Zachary responded to a radio transmission that asked for assistance in surveilling a Lincoln Navigator ("Navigator") whose occupants were acting suspicious. As the Navigator, driven by Defendant, turned onto Kurtz Avenue, Shank followed, several cars behind.

As Shank entered Kurtz Avenue, he saw that the Navigator had apparently turned around and was coming toward him.[1] Defendant turned slightly right, into a small parking lot, presumably to allow Shank's car to pass. A house directly across from the parking lot has a light on a motion sensor, which turns on as soon as a car enters the alley. Shank says that the light was turned on during this time. Shank's car was facing the Navigator, and the Navigator was facing slightly to the left of Shank's car, somewhere about halfway down the street. Both cars had their headlights on. It is undisputed that Defendant's car has darkly tinted side windows and a lightly tinted front windshield.

At that point, Shank claims that he observed the front passenger consuming what he believed to be alcohol. He immediately told Zachary what he had seen and turned on his lights, and both

---

[1] Kurtz Avenue is a dead end, a fact of which Lieutenant Shank was not aware when he first turned down the street. Several witnesses at the evidentiary hearing described it as an "alley" because of its narrow width and short length.

officers got out of the car. Zachary says that he could see the driver and passenger inside the car, and he could tell that the driver was a black male and that the front passenger also appeared to be black. Zachary did not see the open container until he approached the vehicle.

Shank approached the front passenger side of the Navigator and Zachary approached the driver's side. According to the government, neither officer had his gun drawn.[2] Officer Thomas A. Hopkins ("Hopkins"), Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, arrived at the scene after being called as back-up and approached the Navigator from the front. Looking through the front windshield, Hopkins could see both the driver and front passenger seated in the car. As he reached the vehicle, he was able to see a third passenger in the back seat.

Hopkins opened the front passenger door and saw, in plain view, an open bottle of beer on the floor by the passenger's feet. Shank told the vehicle's occupants to keep their hands where he could see them, and Zachary asked Defendant, the driver, to step out of the vehicle and place his hands on the car. At that point, Sergeant John Dittmore ("Dittmore")[3] arrived at the scene and went to the driver's side of the Navigator. Dittmore observed a loaded gun in its holster in a pouch-like compartment of the driver's open door, and notified the officers of his discovery. The officers drew their guns and told the other passengers to get out and place their hands on the car. Defendant then made an unsolicited statement indicating that the gun was his and that it was registered. An officer

---

[2] Shank testified that he did not have his gun drawn. Zachary could not remember if either officer had his gun drawn. Dittmore testified that Zachary did not have his gun drawn, and that he did not notice whether Shank's gun was drawn.

[3] Dittmore testified that he had conducted surveillance of Defendant on at least two occasions prior to the incident in question, but that neither of them resulted in a traffic stop. No other officer who testified had had any previous interaction with Defendant.

-3-

then asked Defendant whether he had a permit to carry a concealed weapon, and Defendant said that he did not.  Defendant was then handcuffed and arrested and taken to the station, and the vehicle was impounded.  Front passenger Darren J. Rodriguez Moreland ("Moreland") was cited for consuming alcohol in a motor vehicle, a fourth degree misdemeanor.

### B. Defendant's Account

Defendant maintains that his vehicle was parked when suddenly an unmarked car turned on its lights and its occupants got out and approached the Navigator.  Moreland asserts that he and Defendant and the other passenger had parked for a few minutes to wait for a friend who lived in a house on Kurtz Avenue.  While parked, Moreland testified that he opened three bottles of beer from a six-pack that was sitting at his feet, and that just as he passed out the bottles, Shank's car turned on its lights.  Moreland asserts that the officers approached before any of the occupants of the Navigator had a chance to begin drinking the beers, and that they were all holding the beers in their laps.

Defendant also contends that his car was parked farther back in the alley than the government indicated.  Moreland testified that he does not believe that the motion light was on at the time; however, another defense witness, Francina M. Johnson, recalled that it was on.  Defendant submitted several photographs, as well as a video recreation of the incident, in an attempt to illustrate that Defendant and the passengers were not visible from Shank's car.  For the video, Defendant chose a car purportedly of the type that the officers used, retraced the route that the officers drove, parked Defendant's car in its purported location in the alley on the night of the traffic stop, and recorded the view from the stand-in police car into Defendant's car.  Defendant argues that the Navigator's tinted windows, combined with the fact that it was dark and that Defendant's headlights were shining

toward the officers' car, means that Shank could not have seen someone inside the Navigator holding a beer bottle. Consequently, Defendant argues that the initial stop of his car was improper, thereby tainting the evidence discovered as a result.

## II. LAW AND ANALYSIS

### A. Initial Stop

Stopping a vehicle and detaining its occupants constitutes a seizure under the Fourth Amendment even where the purpose of the stop is limited and the detention is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). An officer may "search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime." *See Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998). A pretextual traffic stop does not violate the Fourth Amendment where the initial stop is supported by probable cause that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810, 812-13 (1996); *Prouse*, 440 U.S. at 659; *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). To determine whether an officer had probable cause, the court must review "the objective facts known to the officers at the time of the search." *Smith*, 136 F.3d at 1075.

The key to determining whether probable cause existed in the instant case turns on whether it is credible that Officer Shank saw the passenger in the front seat of Defendant's car consuming alcohol. If Shank saw the front passenger consume what Shank believed to be alcohol, in violation of the law, then the officers had probable cause to stop Defendant. If Shank did not see the front passenger holding up a beer bottle through Defendant's windshield, then the government's alleged purpose for making the stop is implausible.

The court finds Officer Shank's testimony credible. In addition, the court has doubts about the probative value of Defendant's numerous photographs and its video recreation of the incident. After a thorough review of all of the evidence, the court finds that it is unlikely that the photographs and video accurately recreate what a human eye could see on the night of the traffic stop. For example, on the video it is difficult to see even the dashboard of the car in which the cameraperson was filming, yet a person driving a car in the dark can make out many more details of the interior of his or her own car. In addition, according to the government's account, which the court finds credible, the cars were positioned at an angle such that Shank's headlights were shining directly into Defendant's car, whereas Defendant's headlights were shining off to the side of Shank's car. Consequently, it seems reasonable that there was enough light so that Shank was able to observe Moreland consuming what Shank believed to be alcohol. Thus, the court finds that the initial stop was supported by probable cause.

### B. Detention

A traffic stop must be reasonable under the totality of the circumstances, and the scope of the search and the officers' actions must be reasonably related to the initial purpose of the stop. *Terry v. Ohio*, 392 U.S. 1, 19, 20 (1968); *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996).

Defendant contends that, even if the officers had probable cause to believe that an occupant of Defendant's car was drinking beer, the resulting detention – "stopping Defendant's vehicle, ordering Defendant out of the vehicle, and/or seizing Defendant" – exceeded the reasonable scope of a traffic stop for an open container violation. (Def.'s Mot. to Suppress at 5-6.) While the level of police presence at the stop was perhaps unusual in the context of an open container violation, the court finds that the officers' actions were reasonable and did not violate Defendant's rights.

Although in some circumstances police may allow a subject to remain in his or her vehicle during such a stop, a police officer may permissibly order the driver and/or passengers to step out of the vehicle as a general safety precaution, even in the absence of a particularized fear. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-111 (1977).

In addition, the fact that Defendant was being surveilled during a drug investigation explains why so many back-up police came to the scene so quickly. Witnesses for both parties testified that the police showed up within moments, so the length of detention was not unreasonable. Additionally, no defense witness testified that any officer had his gun drawn at any point before Dittmore discovered the gun in Defendant's car. Accordingly, the court finds that the length and scope of the detention were reasonably related to the purpose of the initial stop.

### C. Seizure of the Handgun

As the court has found that the initial stop and detention were reasonable, the court rejects Defendant's "fruit of the poisonous tree" theory for suppressing the handgun. The court now examines the totality of the circumstances to determine whether the handgun was reasonably seized.

Police may seize items without a warrant if the items are found in plain view, as long as the police were legally in the place where they discovered the evidence and the item could be immediately identified as contraband or the item is inherently dangerous. *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Frederick*, 152 Fed. Appx. 470, 472 (6th Cir. 2005). A police officer may seize a weapon that is discovered in plain view "if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003).

In the instant case, Sergeant Dittmore testified that when he arrived at the scene, the driver's door was open and he could plainly see a handgun sticking out of a pouch in the car door. Moreover, Dittmore said that he could tell that the gun was loaded. Consequently, the handgun is admissible under the plain view exception to the warrant requirement. Dittmore immediately informed the other officers present of the discovery of the gun. During this time, Defendant was out of the car and had his hands placed against the car. He was not handcuffed. Under the circumstances, the court finds that for reasons of officer safety, it was reasonable for the officers to seize the gun. Therefore, Defendant's Motion to Suppress the gun is denied.

### D. Defendant's Statements

The defense asks the court to suppress two statements that Defendant made to the police during his detention: one regarding the ownership of the gun and another regarding the permit to carry a concealed weapon. Defendant contends that his statements should be suppressed both because they are the fruit of an illegal search (Def.'s Mot. to Suppress at 4) and because the statements were elicited in violation of *Miranda* (*Id.* at 4, 6-7). As the court finds that the initial stop was reasonable, thereby precluding Defendant's "fruits" theory, the court now examines the admissibility of Defendant's statements under the *Miranda* standard.

Any statements given by a suspect during a custodial interrogation are inadmissible unless the suspect has been given his *Miranda* rights and waived them. *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In analyzing whether custodial interrogation exists, courts must look to the totality of the circumstances, including such factors as:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other *indicia* of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Further, interrogation has been defined more broadly than just express questioning, and includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Under the totality of the circumstances in the instant case, the court finds that Defendant was in custody at the time he made both statements. Despite the government's testimony to the contrary, as soon as Defendant was asked to exit his vehicle and place his hands on the vehicle, he was no longer free to leave. The court further finds that Defendant's first statement, regarding the ownership of the gun, was made voluntarily and not due to any interrogation. Although Defendant made the statement directly after Dittmore stated that he had found a gun in the vehicle, the primary purpose of Dittmore's statement was to alert the other officers as a reasonable safety precaution. As Dittmore did not direct his statement to Defendant and the statement was not in the form of a question, the court finds that Dittmore's statement was not reasonably anticipated to elicit an incriminating response. Consequently, Defendant was not being interrogated, and therefore the police were under no constitutional obligation to read Defendant his *Miranda* rights at that point.

However, the next question by the police, regarding whether Defendant had a permit to carry a concealed weapon, was an express question directed to Defendant. Consequently, this statement

was reasonably likely to elicit an incriminating response, and therefore the police should have read Defendant the *Miranda* warnings before asking this question. In the absence of a valid waiver of his *Miranda* rights, Defendant's statement in response to the officer's question about whether Defendant had a permit to carry a concealed weapon is suppressed.

### III.  CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress (ECF No. 9) is granted in part and denied in part. Specifically, the Motion is granted as to the statement Defendant made in response to the officer's question about whether Defendant had a permit to carry a concealed weapon. The Motion is denied in all other respects.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 12, 2007